And we will move now to our third case this morning, John Andren v. The Broiler Chicken Antitrust End User Consumer Plaintiff Class. Mr. Frank. Good morning. Good morning, Your Honors, and may it please the Court, Ted Frank for Appellant John Andren, and I shall endeavor to save four minutes for a rebuttal. It's fine. This Court's precedents in Synthroid and Stericycle and decades back hold that the District Court, in adjudicating a fee request, has the responsibility to construct what a sophisticated negotiation between a sophisticated client and class counsel would have produced ex ante, in this case in 2016. And the District Court's 33.3% award of $57 million contravenes that methodology. It beggars belief that an attorney willing to accept between 12% and 20% between 2010 and 2015 for sophisticated, complex antitrust litigation, and even after 2016, repeatedly, dozens of times, seeking lead counsel status in the Ninth Circuit where there's a 25% benchmark and below for large-scale antitrust litigation, would demand and insist upon and be able to negotiate 33.3% in 2016 just because it was in the Northern District of Illinois. This Court holds that it's a national antitrust market. And if at the margin, class counsel is willing to accept 25%, 20%, 12%, it makes no sense to award 33.3% under this Court's market-mimicking approach. It's the same sort of reversible error that was committed in Stericycle, where the District Court failed to adequately consider evidence of ex ante negotiations. Well, I think in this case, distinct from Stericycle, the judge did consider it, but didn't give it a lot of weight in the discretionary decision about whether to adopt the 33% flat fee, as opposed to the declining marginal rate that had some historical relevance. I mean, that's my reading of Judge Durkin's order here. He took account of the arguments. His methodology in terms of walking through the order of battle here was correct. It's a question of his exercise of discretion and the weight that he put on the different inputs into the decision. Well, whether you call it a question of law or a question of discretion, the reasoning he gives is just simply erroneous. He disregards the bids from 2010 through 2015 because he says it's too old to consider for a 2016 ex ante consideration, except we don't even know that he was looking at it in 2016 because he never says that that's what he's doing. He might have considered it too old relative to 2022, but that's not ex ante, that's ex post. The district court also said, I'm not going to consider these Ninth Circuit awards because they're the Ninth Circuit and they have a 25% benchmark, and that's not this court's market mimicking jurisprudence. But that's exactly backwards. Market mimicking would say, if you're willing to accept 25% in the Ninth Circuit, there's no reason not to accept 25% in the Seventh Circuit unless you can show some sort of evidence that these cases are materially different. And yes, class counsel says, you know, oh, those are different cases in different jurisdictions, but it's not enough to assert that ipsa dixit. All old bids are going to be different cases. You have to be able to say, look, chicken is considerably more risky and complex than an international litigation over lithium batteries that are in dozens of different products. And the reason they didn't make that argument is because it's laughable on its face. They just simply asserted, that's different, so you shouldn't consider it. And the judge said, that's different, so I won't consider it. It's too old. It's the Ninth Circuit. It's a declining marginal rate. And the Seventh Circuit rejects declining marginal rates, which, again, is false. So the district court made many legal errors. There's no negotiated fee agreement in this case. That's correct. The district court did consider the risk of the litigation, the work that counsel had put in, where the case was at the time that it settled, after it had gotten through a motion to dismiss, considered that the summary judgment was forthcoming, and it was not a foregone conclusion as to what would happen. Looking at the analysis of the district court, why would that not be sufficient to justify the discretionary determination of the flat rate? That would be sufficient in many other circuits. It's not sufficient here, where the court requires a market-mimicking approach. It has to look at what a sophisticated client would agree to in advance of the litigation. In addition, the district court repeatedly relied upon expert witnesses that were not presented by class counsel, but were presented by other parties in other litigation, without notice to the class members in this case. We made a motion to the court saying, or we made a filing with the court saying, don't consider these experts, but if you are going to consider them, give us notice so that we have a chance to conduct discovery on the experts or otherwise respond to them. Why was that done in a declaration and not a motion? It was premature to do it as a motion, right? The district court did not say, I am going to consider these experts. As a belt and suspenders measure, we saw, wait a second, 20 days after our objection, the district court issued an order relying on these expert witnesses. Maybe he's going to do it here. Maybe he's going to follow the rules of party presentment, and since class counsel didn't have an expert witness, not rely on experts, as a hypothetical matter, we're just saying if this happens, we want to do it, but it would have been premature to do it as a motion because we would have been told, we didn't submit any experts. Why are you wasting the court's time? And, you know, if the answer is we need to make a motion every time there's a possible thing that the court might consider that the court shouldn't consider that nobody's presented, we would end up burying the court in paper. Rule 23H and Redmond require that parties have notice of the basis for the fee award, and at a minimum, Andrew didn't get that basis because the district court relied so heavily on those experts, which, as we discussed in our papers, were relying themselves on a completely false factual record. I'm happy to answer any other questions the court might have. Hearing none, you can save the rest of your time for rebuttal. Thank you. Thank you. Mr. Berman. Good morning, Your Honor. Steve Berman on behalf of the class in this case. We believe the decision should be affirmed in all aspects. This court has held on three occasions, the Stereocycle case, the Synthroid case, and the Williams case, that you will uphold a district court's fee decision if the court applied the proper methodology, which this court has defined as the following, weighing the available market evidence and assessing it against the amount of work, the risk, and the quality of representation. That's what Judge Durkin did. So he followed this court's methodology, and the issue is did he abuse his discretion, having followed the methodology, and we submit he did not. Look what he did. At first, following this court's mandate, he took a look at the risks and the quality of counsel, and he found that the risks in this case were extraordinary. Extraordinary. And that hasn't been attacked by the appellate. It can't be. There's no facts that suggest otherwise. Judge Durkin found that our effort and work product in this case was, quote, exemplary. That's at page 8 of his opinion. So he made those findings, and then he sat down to do the very task that this court instructed him to do. What would a client have negotiated for if he was hiring a highly competent exemplary lawyer in a high-risk case? That's what Judge Durkin set out to answer. And how did he do that? He did it the exact way this court instructed him to do it. First, he looked at fee agreements in this district, and he found most persuasive to him, the most persuasive fact was the fact that all cases in this court, antitrust cases now, we're not talking about securities cases or Telephone Protection Act cases, which are far less risky. We're talking about antitrust cases. He found that they were all at 33%. That was the market rate. But Judge Durkin didn't stop there. I mean, he really did a lot of work on this case, an extraordinary amount of work. The appellant said that our fees were, quote, selfish, exorbitant, and outrageous. That's what he told Judge Durkin. So Judge Durkin said to the two lead firms, turn over all the fee awards you've gotten and all your other antitrust cases. And we did. And he subtracted out the fee awards that he thought weren't relevant because they were either tied to the mega fund or had some other aberration. And he found that all our fee awards were 33% or more. Mr. Berman, isn't that the rub, taking out some of these data points, the question is whether or not that is beyond his discretion to do so. That's going to be informed by the legal background, obviously. It's going to be informed by the information that Judge Durkin has before him. But can you speak to how that is going to interact with a full national antitrust market? I'm glad you asked that question. There is no full national antitrust market. So what Judge Durkin did was to look at the law. And he said the law in the Ninth Circuit is not very influential to me in the Seventh Circuit because in the Ninth Circuit they have this 25% benchmark. And we have to work at that benchmark. Actually, if you look at the fee awards in the appendix, we often get more than 25%. The 25% is the starting place, and then in the Ninth Circuit you can adjust upward. And sometimes less as well, correct? That's right. So it's just the starting place. It has nothing to do with what we even negotiate. It is, in fact, the antithesis of what this circuit does. It's a plug number that the Ninth Circuit put in to make it easy for judges. It has nothing to do with the market rate. There's absolutely no analysis in any of those cases how they got to the 25%. How are those bids any less bids than outside of the Ninth Circuit, though? But they aren't bids. They're awards given by the court after you're done. It's not what we bid on. We go into court. We know that there's a 25% presumption, and then we ask for more or less. So when we ask for more, that shows we think the market rate really isn't 25%. So what this court does is not a plug number. What this court does, maybe it's grounded in Judge Easterbrook's background in the Chicago School of Economics because he's written a lot of these free opinions. But what this court does is let's look at what the marketplace would do, not a plug number. And let's try to find out what clients would do when they hire real lawyers for these types of cases. And that's exactly what Judge Durkin did. He considered over 94 awards. And he did more than that. To get to your question, Judge Brennan, we can't really look at this decision in isolation. This is part of a huge, enormous case going on. It's going on right now. Summary judgment motions day two are next week in this court. He had fee opinions or fee requests from the direct purchaser plaintiffs and the indirect purchaser plaintiffs. And on his own, Judge Durkin said, I would like you to brief whether I should apply bids, whether I should apply sliding scales. I want to understand the law in a deep and thorough fashion. And if you want to submit expert opinions, I'll take those. So he did. And so in the other cases, he took those expert opinions and, as reflected in his order, he doesn't think that the Ninth Circuit rule should apply here. He doesn't think that it makes any policy sense for these declining fee awards. And he thinks that that's actually in accord with the Synthroid case, which also doesn't think that declining fee awards should be used. So that's how we got there. And I think, importantly, in trying to decide a market rate, going back to those cases, the DPP case, the direct purchaser case, and the commercial case, you can tell I've been in the case too long when I use these acronyms. I'm sorry. Well, there's something like 7,000 district court docket entries up to this point, so you can be forgiven. He went, the experts in that case, noted that that case was comprised of large-scale corporations who bought chicken, right? And they had sophisticated corporate lawyers overlooking this matter. Not a single one objected to the 33% fee. What did that tell Judge Durkin? It told him that sophisticated counsel, sophisticated clients represented by sophisticated counsel, thought in this type of case, in a complicated antitrust case, in this case, as opposed to some other case in the Ninth Circuit, 33% was appropriate. So unless the court, I see I have lots of time left, I could tell you stories about the very first argument here in the Seventh Circuit 40 years ago, but I won't. Unless you have questions, we think that the record is very clear that Judge Durkin, in the middle of this complex case, with many 7,000 docket entries, took a lot of time to think this over. Not just in this case, but in the other fee opinions, he did not abuse discretion. He did an extraordinary amount of work, and he came to the right decision, and we ask that he be affirmed in all aspects. Thank you. Thank you. Mr. Frank. Thank you, Your Honor. I don't think it's quite accurate to say that nobody complains about direct purchaser class counsel rates, because 61% of the market for direct purchasers opted out. And Judge Durkin didn't look at a single one of those fee agreements for the new parallel litigation by the opt-outs. The larger scale companies with sophisticated counsel did not want to be represented by direct purchaser class counsel, and are engaging in their own individual litigation outside of the class action. That leaves just 8,000 or so smaller purchasers, for none of whom it would be economically rational to spend $100,000 on an attorney to go through the fee request and try to reduce it by $10,000, $20,000 to themselves. With respect to what happens in the Ninth Circuit, we're not asking for a court to apply the Ninth Circuit rule. What we're saying is, in a market mimicking approach, you can't say that the Ninth Circuit is below market if you're constantly going back to the Ninth Circuit, willing to be subjected to Ninth Circuit constraints on attorneys' fees. I think the argument is that the Ninth Circuit's benchmark, as a matter of law, of 25% has a distorting effect on fee awards in that circuit. I would agree. If that's below market, it would absolutely be a distorting effect, right? Because then counsel wouldn't show up to sign up for a case where they're going to get awarded below market because they can get market rate elsewhere. That's the very definition of market rate. Why would... Well, only if you consider class actions to be sort of fungible, which they're not. Well, of course not. But you have a sophisticated firm here that's all over the country doing all sorts of innovative litigation. Why would they accept a below market rate? Unless it's not really below market. That's... If I'm... Say I'm a $600 an hour lawyer, and that's my market rate, but to fill up my attorney's time, I have to go to the Ninth Circuit, which caps my rate at $400 an hour or distorts it with a $400 an hour benchmark. My market rate isn't really $600 an hour. Only if it was like a lost leader situation, but your point, I take it, is that the firm keeps going back to the Ninth. There are dozens of times, and the case that they say is a lost leader was 15 years after they signed up to be lead counsel on the gigantic Visa antitrust case. They've been doing this for at least 30 years. And to say that, oh, this 2010 case was a lost leader to get our foot in the door in our home circuit, that makes no sense whatsoever, and there is no evidence for that other than the assertion. And that bid wasn't a 25% bid. The bid wasn't, oh, since your benchmark is 25, we're going to go just under it at 23%. They said, we're willing to do this for 12%. And here's a monotonically decreasing fee, and here's a grid so that if we settle it early, we get less, and we settle it later, we get more. There was a gigantic grid there, and none of it was anywhere near 33%. And there's no argument that this chicken case was somehow more complex. In fact, what happened was on day one, a different law firm comes and brings a direct purchaser complaint, and 12 days later, Huggins-Berman files an indirect purchaser complaint. That's almost verbatim of the initial complaint in this case. So they went into this, maybe it's risky, but the risk was done by the very first firm that filed. And then Huggins-Berman came in and saw that, oh, this looks like a good case. We're going to file and try to peel off our own class counselship, our own subclass, which they did successfully a few months later. If they're willing to take on cases at 12 to 20%, if they're willing to file new cases repeatedly in the Ninth Circuit where there's this distorting effect, which may or may not be a distorting effect, maybe it's above market if they're willing to do it for 12 to 20%. But whatever the rate is, it's not 33 and a third percent because they're not saying, we're staying out of the Ninth Circuit because they're below market. So it really comes down to whether market mimicking means market mimicking. If it just means the district court can rely on a bunch of ex post district court opinions that didn't apply the market mimicking test that were basically ex parte fee requests that didn't have objectors, that didn't have evidence of what other bids were, where the courts never took those bids, and they can't point to a single case where a court looks at the bids and then comes to the 33 and a third. They just have the conclusions, which are very often just rubber stamps of unobjected things. And yes, Judge Durkin did more here. When the direct purchasers asked for 33 and a third before there was any notice to the indirect purchaser class, he did ask for expert reports, but there weren't objectors there, so he didn't have anybody testing those expert reports. He didn't have anybody testing the arguments, and if you look at the expert reports, they're consistently misapplying Seventh Circuit law. They're consistently getting basic facts about the way the market works wrong, and whatever they're defining as market rates, it's not what the Seventh Circuit defines as market rates. And for the court to rely on its earlier decision where John Andrew had no opportunity to respond and wasn't a participant, and then to say, well, you're bound, you might as well not have the 23H hearing because there's already been a decision and the district court feels that it needs to be consistent. Happy to answer any other questions this court might have. Thank you. I think we're done. Thank you. Thank you very much. Our thanks to all counsel. The case is taken under advisement.